IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| RACHEL ANN RIGGIO, | CASE NO. 3:22-cv-00997 |
| Plaintiff, | DISTRICT JUDGE<br>James R. Knepp II |
| vs. | MAGISTRATE JUDGE<br>James E. Grimes Jr. |
| COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION, | **REPORT &<br>RECOMMENDATION** |
| Defendant. | |

Plaintiff Rachel Ann Riggio filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). The matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

## Procedural background

In December 2019, Riggio filed applications for supplemental security income and disability insurance benefits, alleging a disability onset date of November 17, 2019.[1] Tr. 200, 207. She claimed that she was disabled due to

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

bipolar depression with suicidal ideations, anxiety, "bilateral fibulia, shin fracture" and a broken ankle that required surgical intervention with rods, plates, and screws. Tr. 226. The Commissioner denied Riggio's applications at the initial level. Tr. 96–100, 101–05. Riggio applied for reconsideration and, in her applications, advised the Commissioner that the condition of her legs had improved. Tr. 82. She also requested that generalized anxiety disorder be added to the list of her alleged impairments. *Id*. The Commissioner denied Riggio's applications at the reconsideration level. Tr. 110–12, 113–17. Riggio requested a hearing before an Administrative Law Judge (ALJ). Tr. 123–24.

In February 2021, ALJ Mary D. Morrow held a hearing by telephone, at which Riggio and a vocational expert testified. Tr. 29–63. The following month, the ALJ issued a written decision finding that Riggio was not disabled. Tr. 13–24. The ALJ's decision became final in April 2022, when the Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981. Riggio filed this action in June 2022. Doc. 1. She asserts the following assignments of error:

1. The ALJ's decision is not supported by substantial evidence where she failed to consider the effects of Riggio's multiple hospitalizations on [Riggio's] ability to maintain regular attendance in an employment setting.

2. The ALJ's assessment of the opinions of the state agency psychological consultants was not supported by substantial evidence where the ALJ failed to explain how she considered the supportability and consistency of these opinions under 20 C.F.R. § 416.920c and 20 C.F.R. and § 404.1520c, and failed to explain why she was not adopting all limitations outlined by these

2

consultants despite finding their opinions to be
persuasive.

Doc. 9, at 1–2.

## Factual background

*1. Personal and vocational evidence.*

Riggio was born in 1990 and was 29 years old on the alleged onset date
of her disability. Tr. 64. She completed 12th grade without obtaining a diploma
or equivalent. Tr. 36. Pertinently, she has previous work experience as a
warehouse shipping clerk and an assembly line technician. Tr. 38–40. Since
October of 2020, Riggio has worked 22 hours per week as a cashier at a
McDonald's restaurant. Tr. 37. Her father committed suicide when Riggio was
eight years old and her mother died of a possible overdose when Riggio was in
her early twenties. Tr. 1041. Riggio has a history of self-harm. Tr. 54. At the
time of the hearing, she was living alone in a house with her pet cat. Tr. 35,
1063. She has two children who were in the custody of their paternal
grandparents throughout the relevant time period. Tr. 35, 1023.

*2. Medical evidence.*[2]

Riggio receives comprehensive psychiatric care at Unison Health Center
in Toledo, Ohio. Tr. 1022. She is diagnosed with bipolar disorder, generalized

---

[2]  This recitation of evidence is limited to relevant facts provided by the
parties. While physical impairment evidence was presented, Riggio's appeal is
limited to claims regarding her alleged mental health impairment. As such,
this Report and Recommendation will only briefly discuss Riggio's physical
health.

anxiety disorder; and opioid, alcohol, and sedative use disorder. *See, e.g.*, Tr. 319, 795, 1022, 1032, 1041, 1053, 1266–70, 1323, 1442, 1456, 1502, 1519, 1575, 1589, 1615, 1739, 1647, 1660. On four occasions during the relevant time period, Riggio received inpatient psychiatric care. Tr. 323–413, 1265–1325, 1053–64, 1527–38.

In May 2019, Riggio began seeing Unison nurse Carol Krieger, MSN, RN, for medication management. Tr. 1022. Riggio described herself as stable and asked Krieger to refill her medications—Ambien, Seroquel, Prozac, and Clonodine—without adjustment. Tr. 1022, 1026. Krieger obliged. Tr. 1022.

In September 2019, Riggio had an appointment with Krieger. Tr. 1032. Riggio described herself as stable. *Id*. She reported that she was sleeping well and had a good appetite. *Id*. Krieger found Riggio to be talkative and smiling during the appointment. *Id*. She continued Riggio's medications without adjustment. *Id*.

In mid-November 2019, Riggio jumped out of a second-floor window at her home, in what Riggio would later admit was an attempt to end her life. Tr. 316. Emergency services and police were summoned. Tr. 421. Inside the home, responding officers observed a bloody knife, a blood-soaked towel, and a rope fashioned into a noose that was attached to a set of stairs. *Id*. Riggio initially claimed that she had fallen from the window accidentally while attempting to throw her cat out of the window, later acknowledging that she had attempted suicide. Tr. 316.

Riggio said she had been distraught because she wasn't able to see her children, whose paternal grandparents, according to Riggio, had been refusing to comply with a visitation schedule. *Id*. Riggio reported managing her feelings of loss and frustration by abusing alcohol and engaging in self-harm, and said that she decided to end her life when those techniques no longer worked to soothe her. Tr. 316, 421. She said that she had been—uncharacteristically—abusing alcohol on the night that she jumped from the window. Tr. 705.

Riggio's two-story fall resulted in fractures to her right tibia, right fibula, and left ankle. Tr. 316, 795. She was transported in an ambulance to the emergency department of a local hospital where an attending nurse described her as cooperative and displaying some insight. Tr. 316–21. Riggio was admitted to the hospital then transferred to a behavioral health center for care and observation. *Id*. Riggio began receiving medication, attending individual psychotherapy sessions, and participating in group therapy. Tr. 316–21, 390, 399. Within days, Riggio no longer reported any thoughts of self-harm and indicated that her depression had lifted, her sleep had improved, and her appetite had returned. *Id*. Riggio's clinician authorized her discharge from the psychiatric ward after six days, though Riggio remained hospitalized due to her physical injuries. Tr. 304, 400. On December 4, 2019, Riggio had orthopedic surgery in which insert rods, pins, and screws were inserted in her right leg and left ankle to support the healing of her fractured bones. Tr. 296–

301. Riggio was fully discharged the next day, having spent a total of 18 days in the hospital. Tr. 304.

In late January 2020, Riggio saw Nurse Krieger at Unison. Tr. 1040–41. Riggio described herself as stable overall and requested that Krieger adjust her Ambien prescription. Tr. 1040. Krieger noted progress in Riggio's physical recovery, as she observed Riggio walking without the use of a cane or walker. *Id*. Krieger observed that Riggio was "appropriately dressed and groomed" and noted that Riggio's speech was normal, memory intact, mood euthymic,[3] and affect congruent. Tr. 1042, 43. Krieger described Riggio's fund of knowledge, concentration, and attention span as good. Tr. 1402–43. Krieger found Riggio's thought content and process "coherent and goal-directed without evidence of abnormal or delusional thought content or cognitive disturbance." *Id*. Krieger maintained Riggio's medications, adjusting Riggio's Ambien dosage as requested. Tr. 1045.

In March 2020, Riggio sought emergency psychiatric care at a local hospital. Tr. 1265–70. She indicated that she had not taken her medication for two weeks and was feeling suicidal. Tr. 1265. She said that she realized she needed help for her suicidal thoughts after she developed a plan to kill herself by crashing her friend's vehicle. Tr. 1265, 1270. Riggio was admitted to the

---

[3]     Euthymia is a psychiatric term that describes the state of living without mood disturbances. *Euthymia and Bipolar Disorder*, Healthline (last visited Feb. 2, 2023), https://www.healthline.com/health/euthymic. A euthymic person has a calm and steady mood, and typically experiences feelings of cheerfulness and tranquility with an increased resilience to stress. *Id*.

behavioral health unit, where her treating clinician described Riggio's speech as normal, her mood as depressed, and her behavior as withdrawn. Tr. 1269, 1270. Riggio received medication and began treatment in group and individual therapy sessions. Tr. 1321–23. Riggio's mood and affect steadily improved and she reported feeling more hopeful after four days. Tr. 1268–1321. Riggio declined repeated offers to adjust her medications. *Id*. After one week, Riggio was discharged. Tr. 1323. Her treating physician described Riggio as cooperative and pleasant during her final mental health evaluation. *Id*.

In mid-May 2020, Riggio had a telemedicine appointment with Nurse Krieger. Tr. 1499. Riggio denied having suicidal ideation and asserted that she was "agreeable to" taking her medications. *Id*. Riggio asked Krieger for a referral to individual therapy with a counselor but Krieger declined, reminding Riggio that her inability to travel to and from an appointment remained an ongoing issue. *Id*. Krieger observed that Riggio's speech was normal, her concentration and attention span were good, her mood was euthymic and her affect was congruent. Tr. 1502. Krieger continued Riggio's medications without adjustment. Tr. 1504.

Two weeks later, Riggio sought emergency psychiatric care at a local hospital and indicated that she was having suicidal thoughts. Tr. 1053, 1061. Her treating clinician found her alert and fully oriented. Tr. 1056. Riggio reported that she hadn't been compliant with her Effexor medication for four days because she thought it was nauseating her. Tr. 1053. She said she felt

sad, unmotivated, hopeless, helpless, and worthless. Tr. 1063. Riggio was "pushed … over the edge" earlier that day at the Ohio Bureau of Motor Vehicles when she learned that she could not renew her license until she paid the "couple hundred dollar[]" fine she had accrued on an unpaid ticket. Tr. 1061.

Riggio attributed her thoughts of suicide and feelings of increased pressure over the preceding months to such life stressors as the repossession of her car, ongoing legal issues with the father of her children following a "domestic violence situation," restricted access to her children, and repeated financial setbacks. Tr. 1061, 1063. Riggio was admitted to the hospital that evening. Tr. 1061. A routine test revealed that Riggio was unexpectedly pregnant. Tr. 1056. As a result, the attending physician said that he not comfortable providing Riggio with her usual nighttime medications and she became upset. Tr. 1056, 1059. As Riggio's frustration escalated, she indicated that she was no longer suicidal and "just want[ed] to go." Tr. 1056. Then she had a panic attack. Tr. 1059. With some reluctance, Riggio stayed and took medication for anxiety. *Id*. The next morning, Riggio was transferred to a behavioral health unit and permitted her to resume her medications. Tr. 1093. The intervention of treatment and medication improved Riggio's condition. Tr. 1053–1109. After five days, she was discharged. Tr. 1064. Riggio's treating physician found her pleasant, cooperative, and hopeful during a final mental health evaluation. Tr. 1064, 1109.

In July 2020, Riggio had an appointment with Nurse Krieger. Tr. 1519. Riggio indicated she was having nightmares. *Id*. Krieger increased Riggio's Seroquel dosage. *Id*. Krieger noted that Riggio's mood was euthymic and her affect congruent, and found that she had normal speech, an intact memory, good concentration, and a good attention span. Tr. 1519–21.

In August 2020, Riggio arrived at a local hospital emergency department to ask for a psychiatric evaluation and indicated that she was experiencing anxiety and depression with suicidal ideation. Tr. 1442, 1448. Riggio reported that she had stopped taking her Effexor medication due to "improving depression." Tr. 1461. She described feeling helpless, hopeless, and worthless. Tr. 1449. She was admitted to a psychiatric unit, where she received medication, individual counseling, and was encouraged to participate in group activities. Tr. 1455, 1461. The intervention of treatment improved Riggio's mood and affect. Tr. 1461. Four days later, Riggio was evaluated for potential discharge. Tr. 1456. She denied having suicidal ideations, hallucinations, or delusions. *Id*. Riggio's treating clinician described Riggio as mildly anxious, as well as alert, fully oriented, and "feeling more hopeful." *Id*. Riggio said that she had developed a close relationship with her therapist during her hospital stay and wanted to continue individual counseling after her release. Tr. 1455. Riggio's treating clinician authorized her discharge and scheduled her an outpatient appointment. Tr. 1456. Riggio was hospitalized for four days. *Id*.

In September 2020, licensed professional clinical counselor Scott Bieniek conducted a mental status examination at Unison. Tr. 1569–78. Bieniek described Riggio's nonverbal condition as "tearful" but noted Riggio was calm and cooperative with a full affect, organized thought process, intact memory, intact insight and judgment, and euthymic mood. Tr. 1574. Riggio denied having any difficulty with focus or concentration. *Id.*

In November 2020, Riggio had an appointment with Nurse Krieger. Tr. 1608. Riggio described herself as stable and indicated that she remained agreeable to taking her medications. *Id.* Krieger found Riggio's mood to be euthymic, her affect congruent, her speech normal, her attention span and concentration good, and her memory intact. Tr. 1610–12. Krieger continued Riggio's medications without adjustment.[4] Tr. 1613.

In January 2021, Riggio had an appointment with Nurse Krieger. Tr. 1644. Riggio described herself as stable. *Id.* She informed Krieger that she'd found employment at McDonald's, gotten a new apartment, and saw her children twice monthly. *Id.* Krieger conducted a mental status examination which showed no changes since Riggio's previous examination in November 2020. Tr. 1647–53.

In February 2021, Riggio attended individual therapy with counselor Bieniek at Unison. Tr. 1660. Bieniek found Riggio's thought process,

---

[4] Minipress had been added to Riggio's list of medication at some point before the November 2020 appointment with Krieger. Tr. 1613.

orientation, behavior, functioning, "medical condition," and "substance abuse" unremarkable. *Id*. He classified her affect as remarkable, and flat. *Id*.

    3. *State agency and other medical opinion evidence.*[5]

In February 2020, state agency psychologist Courtney Zeune, Psy.D., reviewed the medical evidence and opined that Riggio was not limited in the ability to understand, remember, or apply information. Tr. 66–67. Dr. Zeune further found that there was no evidence to support any limitation in Riggio's ability to: (1) sustain an ordinary routine without special supervision; (2) work in coordination with or in proximity to others without being distracted by them; (3) make simple work-related decisions; (4) be aware of normal hazards and take appropriate precautions; (5) travel in unfamiliar places or use public transportation; (6) set realistic goals or make plans independently of others; and (7) maintain socially appropriate behavior and adhere to the basic standards of neatness and cleanliness. Tr. 66–69.

Dr. Zeune further found that Riggio was not significantly limited in the ability to: (1) carry out very short and simple instructions; (2) carry out detailed instructions; (3) perform activities within a schedule, maintain regular

---

[5]    When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

attendance, and be punctual within customary tolerances; and (4) ask simple questions or request assistance. *Id.*

Dr. Zeune opined that Riggio was moderately limited in the ability to: (1) maintain attention and concentration for extended periods; (2) interact with others; (3) concentrate, persist, or maintain pace; (4) adapt or manage herself; (5) maintain attention and concentration for extended periods; (6) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (7) interact appropriately with the general public; (8) accept instructions and respond appropriately to criticism from supervisors; and (9) respond appropriately to changes in the work setting. *Id.* Dr. Zeune acknowledged Riggio's history of suicidal ideation, noted that her condition improved "some" with medication, and limited Riggio to jobs with a "routine, static work environment." Tr. 69.

In September 2020, upon reconsideration, state agency psychologist Todd Finnerty, Psy.D., affirmed Dr. Zeune's findings. Tr. 85, 90.

In November 2020, Krieger completed a medical source statement on Riggio's behalf. Tr. 1535–37. Krieger stated that Riggio has depressive disorder characterized by suicidal thoughts and bipolar disorder characterized by pressured speech, flight of ideas, a decreased need for sleep, and distractibility. Tr. 1535. Krieger opined that Riggio has a "marked" limitation in the ability to (1) understand, remember, and apply information; (2) interact with others; and

12

(3) adapt or manage herself. Tr. 1536. Krieger further opined that Riggio has an "extreme" limitation in the ability to concentrate, persist, or maintain pace. *Id*. Krieger also said that, in her opinion, Riggio meets the requirements for category "C" classification within Listing 12.04 (Depressive, bipolar and related disorders). Tr. 1536. Krieger classified Riggio's mental disorder as "serious and persistent" and further opined that:

> [Riggio] has a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of <u>both</u>:
>
> 1. "Severe" [m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting that is ongoing and that diminishes the symptoms and sign of mental disorder; <u>and</u>
>
> 2. Marginal adjustments, that is, [that Riggio] has minimal capacity to adapt to changes in [her] environment or to demands that are not already part of daily living.

Tr. 1536 (underlining in original).

   *4. Function report evidence.*

In January 2020, Riggio completed a function report. Tr. 238–45. This self-reported questionnaire asked Riggio to explain how her impairments limit her ability to work. Tr. 238. Riggio wrote, "I have suicide ideation on my low end depressed days that make it so I can't work." *Id*. The report asked Riggio to describe what she did between waking up and going to bed. Tr. 239. Riggio said that because she has trouble brushing her teeth and completing daily grooming tasks, she normally spends her time watching television and "on her

phone." *Id*. She said that she gets tired and has "problems focusing on daily tasks." *Id*. Riggio wrote, "I constantly deal with repetitive racing thoughts." *Id*. She said that she used to walk and run but now is "bedridden" due to suicidal ideation. *Id*. The questionnaire asked Riggio to describe how her impairments affect her ability to feed herself, and she indicated that depression confines her to her bed so she eats whatever is closest to her, and sometimes doesn't eat at all. *Id*. She indicated "N/A" in response to a question asking her to list the household chores she is able to do, explaining that she was, "[t]oo depressed to load the dishes into the dishwasher." Tr. 240. Riggio said that it takes her a long time to get dressed without assistance, that it is too difficult for her to bathe herself, that she is too depressed to care about shaving, and that she sets alarms on her phone that remind her to groom herself and take her medication. Tr. 239–40. She lives alone in a house with her cat, for whom Riggio is responsible. Tr. 239. She feeds the cat daily and freshens his water when the bowl gets low. *Id*.

    *5. Testimonial evidence.*

    Riggio and a vocational expert testified during the hearing in February 2021. Tr. 6–30. Riggio was represented by attorney David Newcomb. Tr. 29. Riggio sees her children every other Sunday. Tr. 52. When she isn't with her children, she spends her time at home, lying down and streaming media on her phone. *Id*. She spends six hours per day on Facebook or talking with friends and family. Tr. 52–53.

She also spends her time at the McDonald's restaurant where she works 22 hours per week as a cashier. Tr. 37. While she can correctly calculate change, Riggio has received several verbal warnings after handing customers their change in the incorrect amount. Tr. 37, 55, 57. She has also been disciplined a few times after missing her shift without notifying anyone at the restaurant. Tr. 57. Riggio attributes these mistakes to her mind being on other things and admits that sometimes, she has trouble thinking clearly. Tr. 55, 57. Riggio says that her mental condition interferes with her performance at work, which is why she can't work there full-time. Tr. 37–38.

Riggio says that she has trouble focusing and is easily distracted. Tr. 55. It's difficult for her to focus on just one thing, and she struggles to pay attention to what she is doing at any given time. *Id*. Once or twice a month, her inability to focus means that she will get on the wrong bus. Tr. 55–56. Riggio is so easily distracted that she would not be able to follow a full-length movie. Tr. 56.

Riggio discussed her experience having bipolar disorder and major depression. Tr. 49. She has anxiety as well as depression; her depression can be very extreme. Tr. 43, 44, 49. She sees a therapist every month and takes her psychiatric medications as prescribed. Tr. 49, 50. Sometimes, Riggio thinks that the medications help. *Id*. Other times, she thinks "they really don't." *Id*. She does not get any side effects from her medications. Tr. 50. She has not needed inpatient treatment since "the middle of 2020." Tr. 51.

Riggio discussed her opioid use disorder, which is in remission. Tr. 44. She has not abused opioids since graduating from an outpatient treatment program in 2016. Tr. 44. Riggio was most recently prescribed opioids for pain management as she recovered from the December 2019 surgery. Tr. 44–45.

Riggio discussed her physical capabilities. She is able to walk for "a mile or two" at a time, and no longer requires any assistive device to walk. Tr. 45–48. She is able to stand for up to two hours, Tr. 48–49, sit for up to four hours, and lift and carry up to 25 pounds, Tr. 49. Riggio bathes and dresses herself, prepares simple meals, does laundry, carries groceries, washes dishes, vacuums, sweeps, and mops her floor. Tr. 49, 53.

After Riggio, vocational expert Rebecca Kendrick testified. Tr. 58–63. The ALJ and Kendrick discussed Riggio's past jobs on a production line and at a warehouse. Tr. 59–60. Kendrick classified Riggio's previous work on an assembly line as unskilled work that generally requires a light exertion level but required a heavy level of exertion as actually performed by Riggio. Tr. 59. Kendrick classified Riggio's previous work at a warehouse as unskilled work that generally requires a medium exertion level but required a heavy level of exertion as actually performed by Riggio. Tr. 60. Kendrick testified that a hypothetical individual with the same age, education, and work experience as Riggio would not be able to perform Riggio's past jobs as actually or generally performed if that individual had the limitations assessed in Riggio's residual

16

functional capacity (RFC),[6] described below. But within Riggio's RFC, Kendrick added, such an individual could perform unskilled work at a light exertion level such as a merchandise marker, house cleaner, or cafeteria attendant. Tr. 61.

The ALJ asked Kendrick to comment on the national economy's tolerance for such an individual to be off task during the workday. *Id*. Kendrick said that spending 15 percent or more of each workday off-task would exceed the amount of time that is acceptable to most employers and preclude such an individual from all work. *Id*.

The ALJ asked Kendrick to comment on the national economy's tolerance for such an individual to leave early, arrive late, or be absent from work. Tr. 62. Kendrick said that leaving early, arriving late, or being absent more than one day per month or approximately eight times per year would exceed the level of absenteeism that is acceptable to most employers and preclude such an individual from all work. *Id*.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

---

[6]     An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard c. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it is the Social Security Agency's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

2. The claimant has not engaged in substantial gainful activity since November 17, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 et seq.).

3. The claimant has the following severe impairments: generalized anxiety disorder; major depressive disorder; bipolar disorder; and opioid use disorder – full remission (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Section 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5. The claimant has the residual functional capacity, 20 CFR 404.1545, to perform light work as defined in 20 CFR 404.11567(b) and 416.967(b) with the following limitations: [she can] never climb ladders, ropes, or scaffolds; never be exposed to hazards such as moving machinery, unprotected heights, or occupational driving; and [] never operate foot controls with the right lower extremity. She can perform simple, routine, and repetitive tasks, but not at a production pace (so, for example, no assembly line work); and can respond appropriately to occasional interaction with supervisors, co-workers, and the general public. She can tolerate few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work environment. Any necessary changes need to occur infrequently and be adequately and easily explained.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born in May of 1990 and was 29 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has a limited education (20 CFR 404.1564 and 416.968).

9.  Transferability of job skills is not material to the determination of disability because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

Tr. 13–23.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

## Discussion

Riggio challenges the ALJ's RFC determination prior to step four, alleging two errors.[7]

---

[7]    Riggio's numbered arguments question the development of, and basis for, the ALJ's determination of Riggio's RFC. I have restructured this discussion to reflect such a formulation. *See* Doc. 11, at 9.

First, Riggio challenges the ALJ's omission of absenteeism in the RFC assessment and claims that the ALJ erred when she failed to address "the evidence showing that Riggio would have exceeded the allowable number of absences in a competitive work setting." Doc. 9, at 17. Riggio cites her admissions for inpatient treatment to argue that the ALJ should have considered the total length of time, and the frequency with which, Riggio will be absent from work due to hospitalization. Doc. 9, at 15–17. Riggio cites her need to obtain prescriptions, attend counseling, and meet with a nurse for medication management to argue that the ALJ should have considered the additional days Riggio will be absent from work due to her ongoing treatment obligations. Doc. 9, at 17. Riggio claims that her treatment and hospitalizations constrain her time enough to potentially preclude her from all work, and that, as such, the ALJ should have addressed absenteeism in the RFC. *Id*.

Second, Riggio challenges the ALJ's assessment of the opinions of the state agency doctors, Dr. Zeune and Dr. Finnerty, noting the evidence that the ALJ cited and arguing that the ALJ failed to comply with applicable regulations. Doc. 9, at 17–18 (citing Tr. 21 and 20 C.F.R. §§404.1520c and 416.920c). In a related claim, Riggio challenges the ALJ's failure to explain her deviation from the shared assessment of the state agency doctors limiting Riggio to "occasional, superficial" interaction at work. Doc. 9, at 20–21 (citing Tr. 69). Riggio notes that although the ALJ deemed the state agency doctors'

opinions persuasive, the ALJ included only an "occasional" interaction limitation in the RFC. *Id.*

1. *The ALJ did not err by omitting absenteeism from Riggio's RFC; substantial evidence supports the ALJ's consideration of Riggio's ability to work, in light of her past hospitalizations and current treatment obligations, without a limitation for absenteeism.*

Riggio submits that during the relevant time period—November 2019 through March 2021—she visited the emergency room four times and was admitted for "at least" 32, but "possibl[y] as many as 39" days. Doc. 9, at 15, *see also* Tr. 323–413, 1265–1325, 1053–1064, 1527–1538. The Commissioner does not dispute these calculations. At the hearing, the vocational expert testified that a hypothetical individual like Riggio would not be able to perform full-time, competitive work if she missed an average of more than one day of work per month or a total of eight absences per year. Tr. 61–62. Riggio argues that her four hospitalizations in 2019 and 2020 would have resulted in approximately 20 absences from work in the 10 months between her first hospitalization to her fourth—exceeding the allowable quota per year as established by the vocational expert. Doc. 9, at 16. Riggio claims that she would likely miss even more time due to intense outpatient obligations, including therapy and medication management appointments, filling her prescriptions, and participating in community support services.[8] Doc. 9, at 16.

---

[8]     In May 2020, Riggio asked Krieger for a referral to a counselor for individual therapy. Tr. 1499. Krieger indicated that she could not refer Riggio until Riggio resolved her ongoing "transportation … issues." Tr. 1499. Riggio's third hospitalization occurred two weeks later. Tr. 1053, 1061. After Riggio's

The ALJ did not include a limitation for absenteeism in Riggio's RFC assessment. Tr. 17–18. Riggio claims that this was an error because the ALJ was "presented with evidence showing that Riggio would have exceeded the allowable absences in a competitive work setting" and yet the decision is "devoid of any discussion on the impact of Riggio's hospitalizations and mental health treatment on her ability to attend work on a regular and consistent basis." Doc. 9, at 16, 17. She argues that this omission demonstrates the extent to which the ALJ's RFC assessment is unsupported by substantial evidence. *Id*. I disagree.

The ALJ was aware of and accounted for Riggio's hospitalizations; she summarized Riggio's relevant hospitalization history. Tr. 19–20. Further, it is true that "[a]bsenteeism due to the frequency of ongoing treatment is a relevant factor for ALJ consideration so long as the treatment is medically necessary and concerns the conditions on which a disability claim is founded." *Griffin v. Comm'r of Soc. Sec.*, No. 2:15-cv-13715, 2017 WL 991006, *2 (E.D. Mich. Mar. 15, 2017); *see White v. Comm'r of Soc. Sec.*, No. 17-cv-12344, 2018 WL 2452209, *7 (E.D. Mich. Apr. 10, 2018). And there is no dispute that Riggio's treatment as an outpatient is medically necessary and concerns the conditions on which her disability claim is based.

---

fourth hospitalization, in August 2020, she began therapy as an outpatient. Tr. 1456. She has not been hospitalized since. Tr. 51.

Riggio, however, never raised absenteeism as an issue before the agency. During the ALJ's examination of the vocational expert, the ALJ asked about a hypothetical employer's tolerance for absenteeism, Tr. 61, but she did not formulate a question taking into account the level of absenteeism to which Riggio now points, *see* Tr. 60–62. When the ALJ offered Riggio's counsel the chance to question the expert, however, counsel said he had no questions. Tr. 62. And counsel's brief that he submitted to the Appeals Council on Riggio's behalf doesn't mention the issue. Tr. 286–88. Given that Riggio was represented by counsel, she is in no position to raise this issue for the first time now.[9] *See Ramsey v. Comm'r of Soc. Sec.*, 973 F.3d 537, 545 (6th Cir. 2020); *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 810 (6th Cir. 2012) ("It is axiomatic that 'a court should not consider an argument that has not been raised in the agency proceeding that preceded the appeal.'") (citation omitted); *see also Fetting v. Kijakazi*, 62 F.4th 332, 338 (7th Cir. 2023).

Even putting this problem aside, it is difficult to fault the ALJ. Riggio focuses on a discrete 10-month window that closed six months before her hearing. But she fails to account for the fact that her repeated hospitalizations occurred during a period of heightened psychiatric distress and were induced by Riggio's medication non-compliance and external stressors in her life that

---

[9]     If Riggio were raising a structural constitutional challenge, her failure to raise the issue below would not affect her ability to raise it now. *See Carr v. Saul*, 141 S. Ct. 1352, 1360–62 (2021); *Ramsey*, 973 F.3d at 545–46. *Carr*, however, doesn't apply to Riggio's challenge. *See Carr*, 141 S. Ct. at 1360 n.5; *Fetting v. Kijakazi*, 62 F.4th 332, 338 (7th Cir. 2023).

have since been greatly alleviated. Tr. 19–21, 1061, 1063. And she doesn't account for the fact that, as the ALJ stated, she has responded well to treatment. Tr. 22. So adopting Riggio's position would obligate the ALJ to have, *sua sponte*, determined that absenteeism ought to be part of Riggio's RFC based on an estimate of the likely frequency and duration of a hypothetical series of future hospitalizations, which would have in turn been based on a finite 10-month period of time without any factual, statistical, or expert opinion evidence to support such speculation.

Riggio is correct that the ALJ did not include absenteeism as a limitation in Riggio's RFC. Doc. 9, at 16–17. But she hasn't shown that substantial evidence required the ALJ to account for its possible effect on Riggio's capacity to work.

Many of the factors that led to Riggio's repeated hospitalizations were resolved by the date of the hearing in February 2021, during which Riggio confirmed that she had not needed inpatient treatment in six months. Tr. 51. By that time, Riggio had acquired insight into her conditions, evidenced by her testimony regarding the helpfulness of her medications and affirmation that she took her medication as directed. Tr. 49. The stress of not seeing her children had lifted too; she testified that she saw them regularly.  Tr. 52. Riggio was maintaining a relationship with her children, living alone in a house, caring for her cat, and working part-time; also, she described herself as stable. Tr. 52, 239, 1063, 1644. Riggio's argument that the ALJ should have considered

absenteeism due to a likelihood of future hospitalization ignores Riggio's stability, which the ALJ's decision highlights. Tr. 19–21.

Riggio's absenteeism argument also ignores evidence of improvement in her mental conditions and capacity to participate in community and daily activities. Tr. 19–22, 22 (discussing Riggio's improvement with treatment and medication, citing her ability to complete a variety of personal care and household activities, and noting her capacity to engage with others as a sponsor and chairperson with AA), 51 (confirming mid-year 2020 as the time period of Riggio's last inpatient hospital stay). These are appropriately considered by the ALJ as the Sixth Circuit has "long held" that an ALJ may consider daily activities in finding that a claimant's allegations are inconsistent with the record. *O'Brien v. Comm'r of Soc. Sec.*, 819 F.App'x 409, 417 (6th Cir. 2020); *see also Miller v Comm'r of Soc. Sec.*, 524 F. App'x 191, 194 (6th Cir. 2013) (holding that an ALJ may consider an individual's work as performed during the alleged period of disability, regardless of whether the work itself would disqualify the individual at step one, since the regulations allow an ALJ to consider such work as an indication of the individual's abilities).

Notably, the record does not contain any medical opinion evidence about absenteeism, either. Tr. 13–23. Dr. Zeune was not concerned with the absences that might result from Riggio's ongoing treatment and did not predict any number of days off that Riggio should expect to need. Tr. 66–69. Dr. Finnerty

did not opine on the issue, Tr. 83–85, and neither did Riggio's own clinician, Nurse Krieger. Tr. 1535–1537. This void in the record about Riggio's future level of absenteeism and its influence on her ability to work supports the ALJ's omission of absenteeism in the RFC.

Even if the speculation suggested by Riggio's argument were appropriate, her math inflates the average number of monthly absent days by limiting the period of time by which those days are divided. Doc. 9, at 15–16. Riggio asserts that each day she spent hospitalized in 2019 and 2020 represents an absence she would have needed from work. *Id*. She arrives at an average number of monthly absent days by dividing the number of hospitalized days by the 10 months during which her psychiatric distress was at its highest, starting with her suicide attempt in November 2019—her first hospitalization—and ending with her fourth hospitalization in August 2020. *See* Doc. 9, at 16. A more accurate average, however, results when Riggio's absences are divided by the entire relevant time period of her alleged disability, starting on the alleged onset date, and ending on the date of the ALJ's decision.

This still would not solve the flaw in Riggio's argument, however—lack of support for her claim that the frequency of hospitalization that she experienced in 2019 and 2020 is an appropriate predictive model for her future needs based on her conditions and symptoms. She fails to provide opinion evidence, facts, or any other supportive basis for her argument. Riggio thus

cannot prevail on the claim that the ALJ's omission of absenteeism was not supported by substantial evidence.

Although Riggio relies on a number of cases, none deals with the issue her argument raises—at what point must an ALJ consider issues not raised by a counseled claimant which are not immediately apparent.

Riggio may now be pointing to evidence to support her claim that the ALJ should have devoted attention to her ongoing treatment, but that is not the question before the Court. "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).

Riggio failed to show how her ongoing treatment obligations would affect her, having failed to establish that either of her monthly appointments requires a full day off from work or that they cannot be scheduled to avoid a work absence. She also cannot show that she would be absent any additional days per month due to future inpatient hospitalizations, since there is no evidence, statistic, or opinion indicating that she will likely need such hospitalization. Since Riggio has not shown that absenteeism could have precluded her from all work and fails to show that its omission in the RFC was not supported by substantial evidence, Riggio's claim should be denied.

2. *The ALJ did not err in evaluating the state agency psychological consultant's opinions, and did not misapply their opinion regarding Riggio's social interaction limitations.*

In her decision, the ALJ found persuasive the opinions of the state agency psychological consultants. Tr. 21. Riggio argues that the ALJ failed to support this finding with substantial evidence. Doc. 9, at 17. Riggio asserts that the ALJ erred when she failed to (1) consider the supportability and consistency of the state agency doctors' opinions, *see* 20 C.F.R. §§ 404.1520c(a); and (2) explain her decision to deviate from the state agency physicians' shared assessment that Riggio was limited to "occasional, superficial social interaction," Tr. 69, and to instead only limit Riggio to "occasional interaction" instead, *id*.

As an initial point, Riggio failed to present these arguments below. According to the Sixth Circuit, this means that they are waived. *Maloney*, 480 F. App'x at 810 ("Maloney had to raise the issue to the agency, and had that opportunity during her administrative appeal to the Appeals Council. Her failure to do so constitutes a waiver."). Even putting this aside, Riggio cannot prevail.

*2.1. The supportability and consistency of the state agency opinions*

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, extent, and examining relationship; specialization; and other factors. 20 C.F.R. §

416.920c(a), (c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

Here, initial state agency consultant Dr. Zeune found that Riggio was moderately limited in her ability to: (1) interact appropriately with the general public; (2) accept instructions and respond appropriately to criticism from supervisors; and (3) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. 68. Dr. Zeune found that Riggio was not significantly limited in her ability to ask simple questions or request assistance. *Id*. She found no evidence that Riggio was limited in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Tr. 69. Upon reconsideration, Dr. Finnerty agreed verbatim with Dr. Zeune's findings. Tr. 85, 90.

The ALJ deemed the opinions of doctors Zeune and Finnerty persuasive, supporting this determination by indicating that their findings were "consistent with the record as a whole" and citing the evidence relevant to that statement. Tr. 21. Generally, an ALJ is permitted to rely on the opinions of the state agency consultants to the same extent that she may rely on an opinion from other sources. An ALJ may thus give greater weight to a state agency doctor's opinion if the doctor's findings and rationale are supported by evidence in the record. The ALJ considered the state agency opinions as follows:

> The opinion of the state agency psychological consultants at the initial and reconsideration levels are found to be persuasive as they are consistent with the record as a whole (1A; 2; 7A; 8A).
>
> More specifically, the consultants opined that the claimant has some degree of limitation with prolonged concentration and fast pace and is limited to occasional and superficial interactions (Id.). Additionally, they opine that the claimant is limited to a routine and static work environment (Id.). Consistent with this opinion and the record as a whole the residual functional capacity above limits the claimant to simple, routine, and repetitive tasks, but not at a production rate pace (so, for example, no assembly line work); and can respond appropriately to occasional interaction with supervisors, co-workers, and the general public. She can tolerate few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work environment. Any necessary changes need to occur infrequently and be adequately and easily explained.

Tr. 31.

Riggio argues that the ALJ failed to explain the supportability and consistency of Dr. Zeune's and Dr. Finnerty's opinions. She says that "the ALJ does not specifically state which records she felt were consistent with the examiners' findings. She also does not mention or assess the 'supportability' of either opinion." Doc. 9, at 18. She adds that "[n]either the ALJ's assessment, nor the decision as a whole, reflects how she considered this factor when assessing the state agency mental RFC opinions." *Id*.

Riggio, however, ignores the fact that the ALJ was not required to use the "magic words" *supportability* and *consistency*. *Cormany*, 2022 WL 4115232, at *3. Rather, it is enough that she actually assessed those factors. And review of the ALJ's decision shows that she did. She pointed to the evidence with which the opinions were consistent. *See* Tr. 21. And then, albeit without using the word supportability, she nonetheless explained that factor. *Id*. And we also know what supported these opinions and was consistent with them because, in addition to reviewing Dr. Zeune's and Dr. Finnerty's opinions, the ALJ explained the problems with Krieger's opinion. The ALJ noted that:

> The claimant is noted to have good attention and concentration and intact memory 3F:27; 8F:49). Additionally, mental health records note significant improvement when compliant with her mediation and the claimant currently works 22 hours per week (Hearing Testimony; 5F:4; 6F:145). She indicated that she will spend six hours of her day on Facebook or talking with her family members (Hearing Testimony). The claimant reported that she is able to prepare simple meals, do laundry, and perform household chores (Id.). She further indicated that she is able to bathe and dress herself (Id.).

33

Tr. 21. Particularly when reading the ALJ's decision as a whole, it is apparent that she followed the regulation.

Based on her premise that the ALJ failed to assess supportability and consistency, Riggio argues that the ALJ's alleged error was not harmless because of deficiencies in Dr. Zeune's and Dr. Finnerty's opinion. Doc. 9, at 18–20. But because Riggio's premise is flawed, there is no need to consider whether the alleged error was harmless.

Further, Dr. Zeune issued her assessment in February 2020. Tr. 66–67. Dr. Finnerty's followed in September 2020. Tr. 85. Riggio's counsel filed a prehearing brief in February 2021 but didn't mention any concerns with the state agency opinions and instead asked the ALJ to "give special consideration to Listing 12.04 or its medical equivalent." *See* Tr. 280–82. Counsel then declined the offered chance to make an opening statement during the hearing. Tr. 34. Unsurprisingly, the ALJ considered whether Riggio met Listing 12.04, as Riggio's counsel requested. Tr. 16.

Riggio sought review before the Appeals Council. Riggio's counsel's brief before the Appeals Council omitted any complaint about Dr. Zeune or Dr. Finnerty. *See* Tr. 286–88. Instead, counsel focused on the ALJ's assessment of Krieger's opinion, argued that Riggio met Listing 12.04, and said that the ALJ violated Social Security Ruling 18-3p. Tr. 286–88.

In the social security context, this Court provides a sort of appellate review and does not try cases in the first instance. *See Bass v. McMahon*, 499

F.3d 506, 509 (6th Cir. 2007). The hearing before the ALJ is "is the 'main event.'" *Freytag v. Comm'r*, 501 U.S. 868, 895 (1991) (Scalia, J., concurring in part and concurring in judgment) (discussing the failure to raise a constitutional issue before the tax court). That adjudication should not "simply [be] a tryout on the road to appellate review." *Id*. It is thus inappropriate for Riggio, who was and is represented by counsel, to go through the entire agency adjudication process saying nothing about alleged errors that predate her hearing only to raise those alleged errors after it is too late for the agency to do anything about them or to decide whether they were errors at all. *See James E. v. Berryhill*, 357 F. Supp. 3d 700, 703 (N.D. Ill. 2019) ("[A]s a practical matter, counsel's failure to raise arguments in the administrative proceedings raises a question about how significant the alleged errors were. And it also raises concerns about sandbagging."); *Burr v. Comm'r of Soc. Sec.*, No. 5:18-cv-518, 2019 WL 3821572, at *3 (M.D. Fla. May 17, 2019), *report and recommendation adopted*, 2019 WL 3817486 (M.D. Fla. Aug. 14, 2019) ("permitting claimants to raise untimely challenges would undermine the incentive to raise the issue at the earliest possible time, which would 'encourage the practice of "sandbagging": suggesting or permitting, for strategic reasons, that the [adjudicative entity] pursue a certain course, and later—if the outcome is unfavorable—claiming that the course followed was reversible error.'"). The Court should consider this aspect of Riggio's argument forfeited. *Ramsey*, 973 F.3d at 545; *Maloney*, 480 F. App'x at 810.

Even considering Riggio's argument—even assuming that the ALJ erred and that the Court should consider the merits of her harmless error argument raised for the first time before this Court—Riggio cannot prevail. She notes that Dr. Zeune completed the assessment of Riggio prior to Riggio's three hospitalizations in 2020. Doc. 9, at 18. Riggio argues that Dr. Finnerty's discussion of those subsequent hospitalizations is not sufficiently robust, lengthy, or detailed, and that the opinion lacks any reference to his consideration of certain portions of the records. Doc. 9, at 18. Riggio argues that it is not "apparent from either Dr. Finnerty's or Dr. Zeune's assessments whether they considered the many mental examinations that took place during these hospital visits, including" those which contain negative status updates or evidence of Riggio's decompensation. Doc. 9, at 18–19. Riggio argues that the state agency doctors' failure to review and consider all of her hospital records "potentially impacted the doctors'—and therefore the ALJ's—assessment of Riggio's ability to concentrate, persist, and maintain pace" which she claims "encompasses the ability to maintain regular attendance at work." Doc. 9, at 19–20 (citing Listing 12.00(E)(3)).

An ALJ need not discuss all evidence in the record that supports a particular finding, as a failure to discuss each observation does not mean that the observations were not considered. *Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x. 661, 665. (6th Cir. 2004). However, "SSR 96-8p provides that where '[t]he an RFC assessment conflicts with an opinion from a medical source, the

36

ALJ must explain why the source opinion was not adopted.'" *Moscorelli v. Colvin*, No. 1:15-cv-1509, 2016 WL 4486851, at *3 (N.D. Ohio Aug. 26, 2016) (citing SSR 96-8p, 1996 WL 374184, at *7).

An ALJ must consider the record as a whole, not just the medical evidence. Here, the ALJ's assessment of Riggio's abilities, including her ability to concentrate, persist, and maintain pace, is contained in the decision. Tr. 19, 20. After discussing the objective medical evidence, the ALJ highlighted the many activities in which Riggio engages that are inconsistent with her claimed degree of limitation, including her alleged limitations in concentrating, persisting, and maintaining pace. Tr. 18–19. Where applicable, the ALJ juxtaposed Riggio's activity with the difficulty she claimed to have. Tr. 18–19. For example, the ALJ noted that Riggio "stated that she has difficulty with her focus. [N]onetheless… she reported that she spends time speaking with friends and on Facebook, and that she is able to use public transportation." Tr. 17. Later, the ALJ wrote that Riggio "stated that she has difficulty focusing on daily tasks; however, she is able to care for her pet cat." Tr. 18.

Turning to the claim Riggio made that she is "bedridden due to suicidal ideations," the ALJ noted that Riggio works up to 22 hours per week at McDonalds, testified to her ability to walk without an assistive device, and estimated the distance she could walk, the amount of time she could stand and sit, and the maximum weight she could lift and carry. Tr. 18. The ALJ highlighted more of Riggio's daily life and activities, such as her living alone,

spending six hours of her day on Facebook or socializing with family members, watching television via a streaming service on her phone, setting reminders to take her medications, seeing her children regularly, bathing and dressing herself, preparing simple meals, doing laundry, and performing household chores. Tr. 18–19. These factors amply support the ALJ's finding that Riggio's alleged limitations are generally not supported by, or consistent with, the record. Tr. 19. The ALJ's RFC assessment of Riggio's abilities is supported by substantial evidence in the record and is not inconsistent with either of the state agency psychologists' opinions. So Riggio's harmless error argument is mistaken.[10] As such, the Court should uphold the Commissioner's decision.

### 2.2. The incorporation of the state agency doctors' "occasional, superficial social interaction" limitation into Riggio's RFC without the word "superficial"

Riggio's final quarrel is about whether she is limited to "superficial" interactions with others or "occasional, superficial" interactions. Doc. 9, at 20–21. Dr. Zeune opined, and Dr. Finnerty agreed, that although Riggio "[d]oes some socializing on a regular basis" she was nonetheless "[l]imited to *occasional*, *superficial* interactions." Tr. 69, 85, 90 (emphasis added). The ALJ accepted nearly all aspects of Dr. Zeune's opinion but, assuming Dr. Zeune intended to indicate Riggio could interact on *both* a superficial and occasional basis, differed slightly as to this limitation being exclusively one or the other.

---

[10]    Riggio says that the ALJ failed to mention the warnings she received at her place of work. Doc. 9, at 19 n.7. Riggio is mistaken. *See* Tr. 19.

Tr. 17–18. The ALJ stated that Riggio "can respond appropriately to *occasional* interaction with supervisors, coworkers, and the general public." Tr. 18 (emphasis added); *see* Tr. 60 (incorporating that portion of Dr. Zeune's opinion in a hypothetical presented to vocational expert Kendrick during the hearing).

It's fair to question whether Riggio has raised a question of any consequence. First, one might wonder whether there is a material difference between *superficial* interactions and *occasional* interactions. The term "superficial interaction" is not defined under the Dictionary of Occupational Titles ("DOT") or Selected Characteristics of Occupations ("SCO"). *Betz v. Comm'r of Soc. Sec.*, No. 3:21-cv-2408, 2022 WL 17717496, at *10 (N.D. Ohio Nov. 8, 2022), *report and recommendation adopted*, No. 3:21-cv-2408, 2022 WL 17985680 (N.D. Ohio Dec. 29, 2022); *see Beulah v. Comm'r of Soc. Sec. Admin.*, No. 1:20-cv-02271, 2022 WL 1609236, at *29 (N.D. Ohio Mar. 25, 2022) ("superficial is not a defined term"), *report and recommendation adopted sub nom. Beulah v. Kijakazi*, No. 1:20-cv-02271, 2022 WL 1606286 (N.D. Ohio May 20, 2022). Second, the Sixth Circuit has found meritless the argument that a limitation to *occasional* interactions was inconsistent with an opined limitation to *superficial* interactions. *Reeves*, 618 F. App'x at 275. Third, although Riggio raises this issue and says "[t]he terms 'occasional' and 'superficial,'…are not interchangeable," she doesn't mention *Reeves* or explain what material difference distinguishes these terms.

Nevertheless, assuming there is a material distinction, an ALJ is charged with assessing a claimant's RFC "based on all of the relevant medical and other evidence" of record. 20 C.F.R. § 416.945(a)(3). Even if an ALJ finds a state agency consultant's opinion "persuasive," because an ALJ has access to all of the evidence, he or she is neither required to "adopt the state agency psychologist's opinion verbatim[] nor … to adopt the state agency psychologist's limitations wholesale." *Reeves*, 618 F. App'x at 275; *see also*, *e.g.*, *Harris v. Comm'r of Soc. Sec.*, No. 1:13-cv-260, 2014 WL 346287, at *11 (N.D. Ohio Jan. 30, 2014); *Gaubatz v. Comm'r of Soc. Sec.*, Case No. 3:19-cv-114, 2020 WL 2487117, at *6 (S.D. Ohio May 14, 2020).  So the ALJ was not obligated to accept the state agency doctors' assessments limiting Riggio to "occasional, superficial" interaction.

The ALJ noted that the state agency physicians had determined Riggio was "limited to occasional *and* superficial interactions." Tr. 21 (emphasis added). Nonetheless, there isn't any conflict between the state agency doctors' shared assessment, Tr. 69, 94, and the ALJ's assessment that Riggio can respond appropriately to occasional interaction, Tr. 18–19. In lieu of an explicit explanation, the ALJ provided evidence in support of her decision to limit Riggio to occasional social interaction at work. The ALJ cited the following ways in which Riggio's testimony and evidence showed that she was capable of more than superficial social interaction: (1) she was, at the time of her testimony, working as a cashier at a McDonald's restaurant 22 hours over

three or four days per week, Tr. 37, 51, a position that requires more than superficial interaction with the general public; and (2) she spent six hours daily talking with family members who were available or engaging online through the social media platform Facebook, Tr. 52–53. These activities demonstrate Riggio's capacity to interact with others for a significant amount of time each day and provide substantial evidence to support the ALJ's determination that Riggio's RFC should include an occasional-interaction limitation.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: April 19, 2023

/s/ James E. Grimes Jr.
James E. Grimes Jr.
U.S. Magistrate Judge

## Objections

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)